IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CRIMINAL NO. 05-20J |
| | ) |
| JOAQUIN R. ACOSTA, | ) JUDGE GIBSON |
| | ) |
| Defendant. | ) |

# Memorandum Opinion and Order of Court

**GIBSON, J.**

This matter comes before the Court on the Defendant's pretrial motions: Motion to Suppress Evidence, Motion to Suppress Statements, Motion to Produce Grand Jury Transcripts, Motion to Dismiss Indictment and the Defendant's Request for Notice of Intent To Use Evidence (Document No. 30). For the reasons stated herein, the Defendant's motions are denied.

**Motion to Suppress and Motion to Suppress Statements**

The Court makes the following findings of fact and conclusions of law with respect to the Defendant's Motion to Suppress Evidence and Motion to Suppress Statements.

FINDINGS OF FACT

1. On January 9, 2005, Pennsylvania State Police Trooper Jeffrey Heltzel (hereinafter "Trooper Heltzel") conducted a traffic stop of a "champagne colored Jaguar" on Interstate 99 northbound in King Township, Bedford County, Pennsylvania after following that vehicle after it exited from the Pennsylvania Turnpike at Interchange 11. Transcript (hereinafter "T") T, pp. 6-7.

2. The evening of the traffic stop, Trooper Heltzel was patrolling in an marked state police vehicle with Trooper Russell Snyder as his passenger (hereinafter "Trooper Snyder"). T, pp. 11, 25, 41.

3.  Trooper Schaefer received an anonymous telephone call on January 5, 2005 indicating the possibility of a "large amount of cocaine" being brought to Altoona, Pennsylvania from North Carolina in a "beige Jaguar with North Carolina registration...between 1/5/05 and 1/9/05." T, pp. 93-95.

4.  Trooper Schaefer, along with Corporal Zimmerman, authored a bulletin regarding the possible cocaine shipments. The bulletin did not mandate that any trooper stop the Jaguar, in that no warrants existed for the search of the vehicle, or arrest any of the vehicle's occupants; and the bulletin stated that probable cause to stop the vehicle must be present before any traffic stop of the vehicle could be conducted. T, pp. 95, 105-106, 110.

5.  On January 7, 2005, Trooper Heltzel learned through a bulletin authored by Trooper Charles Schaefer (hereinafter "Trooper Schaefer") and Corporal Zimmerman on his barracks' daily roll call board that a Jaguar, which had North Carolina registration TNA2724, may be "coming through the interstate or from Interchange 12" while carrying "illegal substances," but that troopers stopping the vehicle would need their own probable cause for a traffic stop. T, pp. 7, 9, 10, 21, 95, 105-106.

6.  The Jaguar had been pointed out to Trooper Heltzel by the toll plaza operator at Interchange 11 and Trooper Heltzel, although occupying a police cruiser which was one car behind the Jaguar at the toll plaza, eventually caught up to the Jaguar, which had turned onto Interstate 99, after two or three minutes and approximately three miles away from the toll plaza at a point where Route 56 intersects with Interstate 99, specifically at mile post nine. T, pp. 8, 11-12, 23-24, 41.

7.  Trooper Heltzel followed the Jaguar, confirmed that its registration matched the one which had been set forth in the bulletin two days prior, and followed the vehicle for "several miles" and clocked it for 3/10 of a mile at a speed of 68 miles per hour in a 65 miles per hour zone and also twice observed the vehicle's left side tires "run onto the center line of the highway;" and a traffic stop was initiated through activation of the lights of Trooper Heltzel's vehicle; Trooper Heltzel continued to follow the Jaguar for a couple more miles after witnessing the traffic violations and then initiated the traffic stop. T, pp. 9-10, 12, 14-15, 23, 41.

8.  Trooper Heltzel followed the Jaguar for a total of five miles after catching up to it on Interstate 99; the traffic stop was conducted at mile post nine, northbound on Interstate 99 at 12:30 a.m. and troopers at the Bedford barracks of the Pennsylvania State Police were notified of the traffic stop and its location. T, pp. 24-25, 30.

9. The speedometer in Trooper Heltzel's vehicle was certified for accuracy in accordance with the Commonwealth of Pennsylvania's requirements for state police vehicles and demonstrated a one mile per hour deviation for the speeds of 10, 20, 30 and 40 miles per hour, but was accurate for the speeds of 50, 60, 70, 80, 90 and 100 miles per hour. T, pp. 13, 22; Government Exhibit 1.

10. Trooper Heltzel parked his vehicle behind the Jaguar on the right berm of the roadway; Trooper Heltzel then exited his vehicle, approached the driver's side of the Jaguar and requested the Defendant's license, vehicle registration and insurance information; Trooper Snyder approached the passenger side of the Jaguar and observed a female passenger in the passenger's seat. T, pp. 15, 42.

11. The Defendant understood these requests and produced the requested information while Trooper Heltzel noticed items hanging from the rearview mirror and attempted to indicate to the driver that he was going to issue him a written warning for his traffic violations and windshield obstructions, but then noticed a "language barrier" when conveying this information to the Defendant; it was not apparent that the Defendant understood Trooper Heltzel's message concerning the written warning. T, pp. 15-16; Government Exhibit 3.

12. Trooper Heltzel requested the Defendant to remain in his vehicle and then returned to his own vehicle to write the warning. T, p. 15.

13. It took approximately five minutes for Trooper Heltzel to "run" a computer check on the Defendant's license and vehicle registration and ten minutes to complete the written warning. T, pp. 31-32, 34; Government Exhibit 3.

14. Approximately fifteen to twenty minutes after the traffic stop was initiated while Trooper Heltzel was filling out the written warning, Corporal Johnson and two other troopers arrived at the scene of the traffic stop; Corporal Johnson was able to speak some of the Spanish language so he, instead of Trooper Heltzel, approached the Defendant. T, pp. 18, 31, 35, 47.

15. Corporal Johnson was called to the traffic stop by Trooper Schaefer because of the presence of suspected narcotics and the need for a canine search of the Jaguar and not for the purpose of speaking and interpreting Spanish. T, pp. 67-68, 106-108.

16. Corporal Johnson approached the Defendant who was standing between the Jaguar and Trooper Heltzel's patrol vehicle and, in Spanish, introduced himself, handed the Defendant his "driver's license, registration and insurance information" and the written warning filled out by Trooper Heltzel, explained to the Defendant it was a warning and

had the Defendant sign the warning. T, pp. 16-17, 34, 47-50, 70, 71-72; Government Exhibit 3.

17. Corporal Johnson then told the Defendant "good-bye" by saying "adios" and the Defendant began walking back to the Jaguar at which time Corporal Johnson asked him in Spanish where he was coming from and where he was going to and the Defendant responded in English that he was traveling from Raleigh, North Carolina to Altoona, Pennsylvania after checking on a job "he had been working on" in Raleigh. T, pp. 50-51, 73, 79, 80-81.

18. Speaking mostly in Spanish, Corporal Johnson then asked the Defendant who the owner of the vehicle was, to which the Defendant responded "Miguel" and gave him a business card for Padilla Construction; Corporal Johnson then asked if there were any weapons, drugs or money in the Jaguar, and the Defendant denied the presence of these items. T, pp. 51, 73.

19. Still speaking in mostly Spanish, Corporal Johnson then requested permission to search the vehicle and the Defendant gave permission to search and Corporal Johnson then said that he would search the Jaguar. T, pp. 52, 73.

20. The Defendant did not appear to be under the influence of any drugs or alcohol or on any medication and did not appear to be drowsy. T, p. 53.

21. Corporal Johnson was dressed in his state police gray uniform with his gun belt and his weapon was holstered; Corporal Johnson did not threaten or promise anything to the Defendant to obtain his consent to search the vehicle and Corporal Johnson did not touch the Defendant in any manner before obtaining consent to search. T, p. 53.

22. Corporal Johnson asked the Defendant to stand by Trooper Heltzel's vehicle and he stood to the right of Trooper Heltzel's patrol vehicle's front driver's side tire while the search of the Jaguar was conducted. T. pp. 53-54, 74, 108.

23. Corporal Johnson then asked the passenger, Miss Morales, to step out of the vehicle and she walked to where the Defendant was standing and Corporal Johnson followed her and explained to both of them that they were not under arrest. T, pp. 52, 74.

24. Corporal Johnson, a K-9 handler for the Pennsylvania State Police and his canine Marko, a certified drug detector dog canine team, conducted a search of the Jaguar which resulted in an indication, *i.e.* a physical scratching, underneath the dashboard in the area of the glove compartment and at the "left rear corner of the trunk." T, pp. 54-57.

25. Corporal Johnson and Trooper Codd searched the trunk and Trooper Schaefer and Corporal Zimmerman searched the areas in the front of the vehicle underneath the hood. T, p. 58.

26. Corporal Johnson left the search of the trunk and went to the front of the vehicle at which time Trooper Codd found suspected cocaine or heroin in the trunk and then the troopers at the front of the vehicle discovered a silver colored "cylindrical object" later found to contain methamphetamine. T, pp. 58-59, 74-75.

27. As a result of the search, the Defendant and his passenger were arrested and transported to the state police barracks while the Jaguar was towed by a tow truck back to the state police garage. T, pp. 59, 75.

28. Corporal Johnson "mirandized" both the Defendant and his passenger, Miss Morales; on January 9, 2005 the Defendant was "mirandized" in Spanish at 3:27 a.m. and Miss Morales was read her rights at 3:06 a.m. T, pp. 59-62, 76, 91. Government Exhibit 2.

29. Corporal Johnson paused after reading each sentence to the Defendant in Government Exhibit 2 and inquired "¿Comprende?" to ask him if he understood the sentence read to him to which the Defendant answered "si" or "yes" but never answered "no"; the Defendant never indicated to Corporal Johnson that he did not understand him. T, pp. 62-64, 91.

30. After the Defendant was read his rights and the waiver and signed the waiver of his rights, the Defendant was asked who owned the drugs, in reference to both packages of illegal substances found, and the Defendant said "yo" which means "I" in Spanish, which Corporal Johnson understood to be "mine." T, pp. 64-65, 77-78, 79-80, 81.

31. The Defendant signed the waiver of rights form in the interview room of the Bedford State Police Barracks in the presence of Corporals Johnson and Zimmerman and Trooper Schaefer and was thereafter interviewed by Corporal Johnson in Spanish and by Trooper Schaefer in English. T, pp. 78, 84-85, 88, 91, 108.

32. Trooper Heltzel later had contact with the Defendant after a consensual search, the Defendant was placed under arrest and Trooper Heltzel "patted him down." T, pp. 18-19.

33. Trooper Snyder stood by the Defendant after he exited the Jaguar, but Trooper Snyder did not speak to the Defendant. T, p. 43.

34. Corporal Johnson has a knowledge of the Spanish language from two years of high school classes and classes in "Command Spanish" since becoming a police officer but is not certified as a Spanish translator. T, pp. 70-71.

35. Trooper Schaefer arrived at the scene of the traffic stop after Corporal Johnson had arrived and was told by Corporal Johnson that the Defendant had given his consent to search the Jaguar but the canine search of the Jaguar had not occurred yet; Trooper Schaefer participated in the "hand search" of the vehicle after the canine search, specifically the "engine compartment" which uncovered a "cylindrical object" that was later found to contain methamphetamine. T, pp. 83-84.

36. The Defendant refused to answer where the drugs were going or for whom they were intended by saying "I don't want to say too much" and thereafter the police ended their interview. T, pp. 85, 87.

37. The interview of the Defendant lasted approximately fifteen minutes. T, pp. 91-92.

38. The Defendant indicated that he put the cocaine in the Jaguar, but denied knowledge of the methamphetamine. T, pp. 86, 109.

39. The Defendant's responses concerning more specific questions regarding the illegal substances which had been recovered appeared to reveal the Defendant did not understand English sufficiently regarding these words and questions in order to be able to answer such questions. T, pp. 85-87.

40. Trooper Schaefer only asked questions regarding the Defendant's name, address and other biographical information prior to him being "mirandized." T, p. 87.

41. Trooper Schaefer uncovered five items of identification from the Defendant's wallet: a resident alien identification, a Mexican consulate identification card, a North Carolina driver's license, a social security card and another Mexican identification card; Trooper Schaefer kept the North Carolina Driver's license and forwarded the other four pieces of identification to Agent Richard Nikoloff of Immigration and Customs Enforcement (hereinafter "ICE"). T, pp. 88-89.

42. Based upon ICE's review of the forwarded documents and its conclusion that the documents were not valid, Trooper Schaefer spoke to the Defendant, after his indictment in this matter, and questioned the Defendant regarding his entry into the United States, his residence and family members. T, pp. 89-91.

6

43. When Trooper Schaefer called Corporal Johnson to come to the scene of the traffic stop, Trooper Schaefer, although not stated explicitly, understood that his request for the presence of Corporal Johnson was for the purpose of Corporal Johnson and his canine Marko searching the Jaguar for illegal substances. T, pp. 107-108.

44. Trooper Schaefer handcuffed the Defendant at the scene of the traffic stop. T, p. 108.

45. The Defendant never requested an attorney. T, pp. 80, 87, 108-109.

CONCLUSIONS OF LAW

1. The Fourth Amendment to the United States Constitution reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

2. Probable cause must exist in order to justify the traffic stop of a motor vehicle because a stop of a motor vehicle "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment.]" However, the "[s]ubjective intentions [of police officers] play no role in ordinary, probable-cause Fourth Amendment analysis" *Whren v. United States*, 517 U.S. 806, 809-810, 813, 116 S.Ct. 1769, 1772, 1774, 135 L.Ed.2d 89, 95, 98 (1996)(citations omitted).

3. Probable cause is evaluated based upon a totality of the circumstances approach. *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 800, 157 L.Ed.2d 769, 775 (2003); *U.S. v. Glasser*, 750 F.2d 1197, 1205-1206 (3d Cir. 1984).

4. Trooper Heltzel, based upon the objective factor of his timing of the speed of the Defendant's Jaguar for 3/10 of a mile on Interstate 99, possessed probable cause to conduct a traffic stop of that vehicle for a violation of the Pennsylvania law prohibiting operation of a motor vehicle in excess of the maximum speed limits and failing to drive within lanes lined for traffic and during such stop, a review of the Defendant's license and registration was permissible. *See U.S. v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989).

5. The stop of the Jaguar was based upon probable cause and not upon the information provided through the anonymous tip given to Trooper Schaefer.

6. "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete

that mission." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 837, 160 L.Ed.2d 842, 846 (2005).

7. After the return of the Defendant's paperwork and issuance of a written warning by Trooper Heltzel and delivered by Corporal Johnson, the traffic stop was terminated and the Defendant was not in custody; and Corporal Johnson began to walk toward his patrol vehicle but Trooper Johnson reinitiated contact with the Defendant inquiring of his travel plans, which resulted in a consensual mere encounter between the two gentlemen.

8. In considering the totality of the circumstances, a seizure of the Defendant did not occur before or during Corporal Johnson's discussion with the Defendant because Corporal Johnson did not verbally order him to answer his questions or remain on the roadside or by his physical actions or posture require compliance of the Defendant in anyway; a reasonable person would have felt "free to leave" before and during this conversation with Corporal Johnson. *U.S. v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980); *Bostick v. Florida*, 501 U.S. 429, 435, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389, 399 (1991).

9. The Government bears the burden of demonstrating that a person, who is not in custody, voluntarily gave consent to search, "and [that such consent was] not the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854, 875 (1973).

10. Consent to search is determined through an evaluation of the totality of the circumstances. *Id.* at 227, 93 S.Ct. 2041, 2047-2048, 36 L.Ed.2d 854, 862-863 (1973).

11. "Voluntariness is a question of fact to be determined from all the circumstances,..." *Id.* at 248-249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854, 875.

12. The Government has the burden of proof to demonstrate that consent to search was given by a preponderance of the evidence. *U.S. v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242, 253 (1974). *See also U.S. v. Morales*, 861 F.2d 396, 399 (3d Cir. 1988).

13. "[A] driver [of a vehicle] has the authority to consent to a full search of a vehicle." *U.S. v. Morales*, 861 F.2d 396, 399 (3d Cir. 1988).

14. The Defendant responded in English to Corporal Johnson's questions in Spanish regarding the Defendant's travel plans; the Defendant had *sufficient comprehension* of the English language to understand and consent to Corporal Johnson's request for

8

Defendant's permission to search the Jaguar.

15. No evidence has been presented that other than the Defendant's primary use of the Spanish language, that other difficulties or circumstances were present that would vitiate a knowing, intelligent or voluntary waiver of his right to remain silent and his right to consult with an attorney: the Defendant was twenty-three years old, was not shown to have any psychological or physical barriers to understanding what was occurring, no physical or verbal threats or verbal promises were known to have been made to the Defendant to coerce him into making or were made in exchange for his statement, and the Defendant was not withheld food, drink or use of restroom facilities while in the custody of the Pennsylvania State Police.

16. Despite the Defendant's sufficient comprehension of the English language, the Defendant's subsequent waiver of his right to remain silent and his right to consult with an attorney were explained to him in the Spanish language, on a Spanish language form, provided to and signed by the Defendant, thus indicating a knowing, intelligent and voluntary waiver of his right to remain silent and his right to consult with an attorney. Government Exhibit 2.

17. The Defendant's incriminating statements and the objects found as a result of the consensual search of the Jaguar are not "fruit of the poisoness tree," as the stop of the Defendant's Jaguar was a legal, permissible vehicle stop that does not taint any further evidence derived therefrom.

## Motion to Produce Grand Jury Transcripts

The Defendant has moved for the production of the grand jury transcripts regarding this matter without further argument in his brief. The Defendant claims that the transcripts contain "exculpatory evidence to which he is entitled as *Brady* material."[1]

Federal Rule of Criminal Procedure 6(e) governs the pretrial production of grand jury testimony. *United States v. Budzanoski*, 462 F.2d 443, 454 (3d Cir. 1972). Rule 6(e)(3)(E) reads in pertinent part:

---

[1] The Court does not believe there is any substance to the Defendant's belief that the grand jury transcripts contain exculpatory evidence and that he holds some inside knowledge of the relevant secret grand jury proceedings, but that any use of the word "belief" in this motion appears to based upon speculation.

9

> **(E)** The court may authorize disclosure--at a time, in a manner, and subject to any other conditions that it directs--of a grand-jury matter:
>
> **(i)** preliminarily to or in connection with a judicial proceeding;
>
> **(ii)** at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury;

FED. R. CR. P. 6

> To support a motion for a judicially ordered disclosure of grand jury testimony, a party must show a particularized need for that information which outweighs the public interest in secrecy. *United States v. Proctor & Gamble Co., supra* at 683, 78 S.Ct. at 986. Once such a need is shown, the district court "must weigh the competing interests and order so much disclosure as needed for the ends of justice." *In re Grand Jury Matter (Catania),* 682 F.2d 61, 62 (3d Cir.1982). In balancing the competing interests, the district court "necessarily is infused with substantial discretion." *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 223, 99 S.Ct. 1667, 1675, 60 L.Ed.2d 156 (1979). This court must analyze a district court's decision to disclose grand jury information only to determine if there was an abuse of that discretion. 682 F.2d at 65.

*U.S. v. McDowell,* 888 F.2d 285, 289 (3d Cir. 1989).

The Plaintiff has failed to demonstrate a particularized need, but has only raised his constitutionally entitled right to information that may be exculpatory and which the Government must produce should it exist. Without a showing of a particularized need for this information based upon *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Court will deny the Defendant's motion and remind the parties that the Court's pretrial order will require production of all previously undisclosed *Brady* material no later than one week prior to trial. The Defendant's motion to produce grand jury transcripts (Document No. 30) is denied.

## Motion to Dismiss Indictment

The Defendant also moves to dismiss the indictment because the indictment is "not supported by probable cause because the charges were filed based on evidence gathered in violation of the Defendant's Constitutional rights as guaranteed by the Fourth, Fifth, Sixth and Fourteenth Amendments." Defendant's Motion, ¶ 17.

Grand juries return an indictment based upon a finding of "probable cause, or a reasonable probability, that a crime has been committed" *Banco de Desarrollo Agtropecuario, S.A. v. Gibbs*, 640 F.Supp. 1168 (S.D.Fla. 1986) citing *U.S. v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965). *See also Talmente v. Romero*, 620 F.2d 784, 789 (10th Cir. 1980); *Silverthorne v. U.S.*, 400 F.2d 627, 634 (9th Cir. 1968). Grand juries may consider evidence that is "incompetent," "inadequate" and otherwise inadmissible at trial because it was obtained in violation of the constitutional rights of an accused. *Costello v. U.S.*, 350 U.S. 359, 363-364, 76 S.Ct. 406, 408-409, 100 L.Ed. 397 (1956); *Lawn v. U.S.*, 355 U.S. 339, 349-350, 78 S.Ct. 311, 317-318, 2 L.Ed.2d 321, (1958); *U.S. v. Calandra*, 414 U.S. 338, 344-346, 94 S.Ct. 613, 618-619, 38 L.Ed.2d 561, (1974); *U.S. v. Helstoski*, 635 F.2d 200, 203 (3d Cir. 1980)(citing *Costello, Lawn* and *Calandra*).

Because the Court has found that the physical evidence from the search of the Jaguar as well as the incriminating statements of the Defendant were obtained legally, such evidence, if presented to the grand jury, was clearly within the boundaries of evidence that may be presented to the grand jury in accordance with the precedent cited above. Furthermore, such evidence establishes probable cause to charge the Defendant with the crimes for which he was indicted. Because the Court can only assume

that such evidence was presented to the grand jury, and that no evidence presented to this Court in the case *sub judice* was found to be otherwise incompetent or obtained in violation of the Constitution or laws of the United States, the Court will deny the Defendant's motion.

### Defendant's Request for Notice of Intent to Use Evidence

Finally, as to the Defendant's Request for Notice of Intent to Use Evidence, which requests the Government to "provide notice of its intention to use any evidence other than that heretofore provided via discovery" the Court notes that a defendant is entitled to "request notice of the government's intent to use (in its case-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16." The Defendant's request is certainly general in scope. Among the evidence that the Government must disclose under Federal Rule of Criminal Procedure 16 are statements (oral, written or recorded) of the Defendant, the Defendant's prior record, documents and other objects that are material for preparing the defense, will be used by the Government in its case-in-chief, or that belong to the Defendant, reports of any scientific testing or exams, and written summaries of expert testimony the Government intends to introduce in its case-in-chief.

The Government avers that it has complied with Rule 16 in all respects. The Court also notes that there has been no indication from the Defendant that the Government has failed to comply with Local Criminal Rule of Court 16 (C) & (D), which require that after a failure of a party to produce additional discovery that was requested by the opposing party, the requesting party can move for discovery either indicating that a conference between counsel regarding resolution of the discovery dispute could not be held, or was held without a resolution.

Therefore, based on the Government's averment of compliance with Rule 16 and the failure of the Defendant to comply with Local Rule of Court 16, the Court will deny the Defendant's motion.

An appropriate Order follows.

**AND NOW**, this 14th day of July 2006, this matter coming before the Court on the Defendant's pretrial motions, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT: 1) the Defendant's Motion to Suppress Evidence (Document No. 30) is DENIED; 2) Defendant's Motion to Suppress Statements (Document No. 30) is DENIED; 3) Defendant's Motion to Produce Grand Jury Transcripts (Document No. 30) is DENIED; 4) the Defendant's Motion to Dismiss Indictment (Document No. 30) is DENIED; and 5) Defendant's Request for Notice of Intent to Use Evidence (Document No. 30) is DENIED.

                                                    BY THE COURT:

                                                    _____
                                                    KIM R. GIBSON,
                                                    UNITED STATES DISTRICT JUDGE